1 | Allen Hyman (California State Bar No. 73371)
LAW OFFICES OF ALLEN HYMAN
2 | 10737 Riverside Drive
North Hollywood, CA 91602
3 | Phone: (818) 763-6289
E-mail: lawoffah@aol.com
4 |
Matthew F. Schwartz * *Pro Hac Vice Pending*
5 | Brian S. Levenson * *Pro Hac Vice Pending*
SCHWARTZ, PONTERIO & LEVENSON, PLLC
6 | 134 West 29th Street, Suite 1001
New York, New York 10001
7 | Phone: (212) 714-1200
E-mail: mschwartz@splaw.us
8 | E-mail: blevenson@splaw.us

9 | Oren S. Giskan * *Pro Hac Vice Pending*
GISKAN SOLOTAROFF & ANDERSON LLP
10 | 90 Broad Street, 10th Floor
New York, New York 10004
11 | Phone: (212) 847-8315
E-mail: ogiskan@gslawny.com
12 |
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SA MUSIC, LLC, WILLIAM KOLBERT, AS TRUSTEE OF THE HAROLD ARLEN TRUST, RAY HENDERSON MUSIC CO. INC., FOUR JAY MUSIC COMPANY, and JULIA RIVA,

Plaintiffs,

v.

GOOGLE. LLC, PICKWICK INTERNATIONAL LIMITED, PICKWICK GROUP LIMITED, PICKWICK AUSTRALIA PTY LTD., and MASTERCORP PTY. LTD.,

Defendants.

**COMPLAINT FOR COPYRIGHT INFRINGEMENT**

**JURY DEMAND**

### Basis for Jurisdiction

1.   The Court has jurisdiction over the subject matter of this action against all Defendants pursuant to 28 U.S.C. § 1338(a) because this is an action for copyright

1

infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101, 106, 115, 501, 602 *et seq.*

**Introduction**

2.     Plaintiffs are the legal and/or beneficial copyright owners of musical works authored by Harold Arlen one of the premier composers of American music.

3.     Harold Arlen wrote or co-wrote some of the most popular modern songs, including *Over the Rainbow* from The Wizard of Oz and many other seminal works in the American songbook, including *I've Got the World on a String*, *Stormy Weather*, *The Devil and the Deep Blue Sea*, *Come Rain or Come Shine*, *Get Happy*, *Ill Wind* and *It's Only A Paper Moon*.

4.     Ray Henderson wrote or co-wrote some of the most popular modern songs, including many seminal works in the American songbook, including *Bye Bye Blackbird, Has Anybody Seen My Girl? (a/k/a "Five Foot Two, Eyes of Blue"), I'm Sitting on Top of the World, Life Is Just a Bowl of Cherries, Varsity Drag, The Best Things in Life Are Free, Button Up Your Overcoat* and *Animal Crackers in My Soup*.

5.     Harry Warren wrote over 800 songs, including *At Last, Chattanooga Choo Choo, I Only Have Eyes for You, You Must Have Been a Beautiful Baby, Jeepers Creepers, The Gold Diggers' Song (We're in the Money), Lullaby of Broadway, You'll Never Know, On the Atchison, Topeka and the Santa Fe, That's Amore, Nagasaki, There Will Never Be Another You,* and *The More I See You*.

6.     The Composition Chart annexed as Exhibit A provides a list of Plaintiffs' copyrighted compositions at issue in this case (the "Subject Compositions").

7.     The works of Arlen, Henderson, and Warren have been recorded by the most prominent jazz and popular artists of all time, including Art Tatum, Art Blakey, Benny Goodman, Billie Holliday, Buddy Rich, Cab Calloway, Charlie Parker, Count Basie, Dean Martin, Dizzy Gillespie, Duke Ellington, Ella Fitzgerald, Etta James, Frank Sinatra, Fred Astaire, John Coltrane, Judy Garland, Lena Horne, Louis

2

Armstrong, Miles Davis, Quincy Jones, Ray Charles, and Sarah Vaughan to name only a few. These monumental works of art are, quite literally, national treasures.

8.    These and other recordings of Plaintiffs' copyrighted musical works have been pirated by the Defendants in this case. Defendants are all players in the digital music business that participate in, and jointly profit from, making digital phonorecord deliveries (*i.e.*, downloads) of pirated recordings of the Subject Compositions.

9.    Digital phonorecord deliveries of musical recordings constitute a reproduction and distribution of the musical work embodied in the digital recording and require a license from the copyright owner of the musical composition, sometimes referred to as a "mechanical license."

10.    Defendants have failed to obtain any license that would authorize them to reproduce, distribute, or sell the recordings of the Subject Compositions identified on Exhibits B-D and, as a result, Defendants have infringed Plaintiffs' exclusive rights of reproduction and distribution of the Subject Compositions, under 17 U.S.C. §§ 106(1) and 106(3).

11.    Further, the activity of making digital phonorecord deliveries of pirated recordings of the Subject Compositions does not qualify for a compulsory license or as a covered activity under Section 115 of the Copyright Act.

12.    A list of the pirated recordings of the Subject Compositions that Defendants have reproduced and distributed without authorization, including by making digital phonorecord deliveries, thus far identified, is set forth in the Infringement Chart annexed as Exhibits B-D.

13.    All the recordings identified on Exhibits B-D are pirated. Plaintiffs have thus far identified over 900 pirated recordings of the Subject Compositions that have been separately reproduced and distributed as digital phonorecord deliveries by Defendants in the Google digital music store as set forth in the Infringement Chart

annexed as Exhibits B-D. Defendants have infringed these works in a concerted and distinct distribution chain.

## Defendants' Piracy is Massive and Flagrant

14.    Google Play sold pirated recordings, provided by Pickwick, of virtually every well-known recording artist from the 1930s through the 1960s, including Frank Sinatra, Ella Fitzgerald, Miles Davis, Louis Armstrong, Billie Holiday, Mel Tormé, Ray Charles, Lena Horne, and Judy Garland.

15.    The scope and flagrant nature of Defendants' piracy cannot be understated. It is obvious that the recordings listed in Exhibits B-D are pirated by virtue of the scope of the Pickwick catalog and the replication of the original album artwork while removing the original label logos.

16.    Album cover art has been an essential part of the packaging and marketing and labels have taken great care to create album artwork commensurate with the music it accompanied. Not so with Pickwick, which steals the album art and music wholesale for its bootlegged album, except for the removal of the logo of the issuing record label:

   

*Columbia Release*        *Vogue Release*        *RCA Release*        *Decca Release*

  

*Pickwick*        *Pickwick*        *Pickwick*        *Pickwick*

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17.    In 1958 Lion Records released Lena Horne's album, <u>I Feel Smoochie</u>, which included her acclaimed version of *Come Rain Or Come Shine.* Defendants copied the album wholesale, including the artwork, and offered it for sale on Google Play:




*Lion Records 1958*                    *Cool Note*

18.    In 1957, Verve released the album <u>Buddy Rich Just Sings</u> which included Rich's recordings of two Arlen songs, *Between The Devil And The Deep Blue Sea* and *It's Only A Paper Moon*. Defendants copied the recordings and the artwork, removed the Verve logo, and offered it for sale on Google Play:




*Verve (1957)*                    *Hallmark (2010*

5

19.     In 1961, Pearl Bailey recorded a dozen Arlen compositions for Roulette on the album, <u>Pearl Bailey Sings The Songs She Loves By Her Favorite Composer Harold Arlen</u>. Defendants copied the album wholesale, including the artwork, and offered it for sale on Google Play, minus the Roulette logo:




*Roulette (1961)*                    *Hallmark (2011)*

20.     All of this should have made it obvious to Google that Pickwick is operating a huge music piracy operation. Google had actual knowledge of, and/or willfully chose to ignore, the evidence of piracy and participated in the infringement on a massive scale.

21.     To put this case in context, in 2007, Jammie Thomas-Rasset, a single mother of four in Brainerd, Minnesota, was found liable, after three separate jury trials, for copyright infringement for using file sharing software that enabled the unauthorized downloading and distribution of 24 recordings by the Goo Goo Dolls and Def Leppard, among others. The juries awarded statutory damages in all three trials of up to $80,000 per infringement. The Eighth Circuit Court of Appeals ultimately affirmed statutory damages in the amount of $9,250 for each infringed recording, for a total award of $222,000. Ms. Thomas-Rasset declared bankruptcy as she had "no other option."

22.     In 2009, Joel Tenenbaum, a Massachusetts college student, who also used file-sharing software that permitted others to download 30 recordings by Limp

Bizkit and Blink-182, was found liable and the jury awarded statutory damages of $22,500 per recording, for a judgment that totaled $675,000 forcing Mr. Tenenbaum to file for Chapter 7 bankruptcy.

23.     Unlike Ms. Thomas-Rassett and Mr. Tenenbaum who were not alleged to have sold their infringing recordings or profited from their conduct, Defendants in this case have engaged in massive music piracy operation for the purpose of generating profits from their sales of pirated recordings and by other means.

24.     The copyright infringement operation detailed in this Complaint is only the latest in a long line of piracy schemes that have plagued composers, publishers, and record labels since the inception of the music industry over 100 years ago, when the perforated rolls used by player pianos to perform musical works were pirated. See *Aeolian Co. v. Royal Music Co.*, 196 F. 926 (W.D.N.Y. 1912).

25.     As the technology employed by the music industry to reproduce musical works advanced, bootlegging efforts by music pirates kept pace. In the 1960s and 1970s, organized criminal enterprises engaged in record and tape piracy operations on a scale that is dwarfed by the infringing conduct explained herein. Like the Defendants in this case, the "tape pirates" and "record pirates" of years past unlawfully duplicated popular pre-existing recordings, and then claimed their liability was limited by the compulsory license provision of the 1909 Copyright Act, § 1(e).

26.     The landmark case *Duchess Music Corp. v. Stern*, 458 F.2d 1305 (9th Cir. 1972) settled the issue as to whether tape pirates could limit their liability for piracy under the compulsory license provision of the 1909 Copyright Act. In *Duchess*, the defendant tape pirate engaged in the same conduct identified in this Complaint, and claimed her conduct was lawful because the compulsory license provision of the Copyright Act authorized the reproduction and distribution of the musical works embodied on the recordings she pirated. The Ninth Circuit rejected the argument, stating, "She may not continue her piracy under the flag of compulsory licensing."

The *Duchess* court concluded that the tape pirates' activity was ineligible for a compulsory license and that reproduction of a musical composition on a pirated recording infringed the copyright in the composition, even when a compulsory license was claimed.[1]

27.    The holding in *Duchess* was codified when the Copyright Act was revised in 1976. The statutory bar against compulsory licensing of pirated recordings continues in the recent amendments to Section 115 of the Copyright Act, which provides that reproduction and distribution of pirated sound recordings is not a covered activity under Section 115 and is ineligible for a compulsory license.

28.    Defendants are nothing more than modern tape pirates and their conduct constitutes willful copyright infringement of the Subject Compositions in violation of the United States Copyright Act [17 U.S.C. §§ 101, 106, 115, 501, 602 *et seq.*] (the "Copyright Act").

### *SA Music, LLC*

29.    Plaintiff SA Music, LLC is a Nevada limited liability company and Sam Arlen is the sole member of the company.

### *The Harold Arlen Trust*

30.    Plaintiff William Kolbert is the Trustee of the Harold Arlen Trust (the "Harold Arlen Trust"), a trust created by Harold Arlen in his will.

### *Ray Henderson Music Co. Inc.*

31.    Plaintiff Ray Henderson Music Co. Inc. is a Delaware corporation with a principal place of business in Maryland.

---

[1] The criminal conduct of "tape pirates" became a priority of the Attorney General of the United States, Edward H. Levi, in 1975 when the Justice Department determined that decisions reached by four Circuit Courts of Appeals, including the Ninth Circuit in *Duchess*, rendered tape pirates criminally liable even where the statutory royalty was tendered. See *Heilman v. Levi*, 391 F.Supp. 1106 (E.D.Wisc. 1975). Criminal copyright infringement sentences continue to this day. See *Matter of Zaragoza-Vaquero*, 26 I&N Dec. 814 (BIA 2016)(defendant sentenced to 33 months in prison and ordered to be removed from the United States for selling bootleg copies of music CDs at a Florida flea market, as a crime involving moral turpitude).

### *Four Jays Music Company*

32.     Plaintiff Four Jays Music Company is a California corporation with a principal place of business at 421 E. 6th St. in Los Angeles, California.

### *Julia Riva*

33.     Plaintiff Julia Riva is Harry Warren's granddaughter and the President of Four Jays Music Company. Julia Riva is a resident of Los Angeles, California.

### *Google*

34.     Defendant Google LLC ("Google") is a limited liability company organized under the laws of the State of Delaware with a place of business at 1600 Amphitheatre Parkway, Mountain View, California.

35.     Google has owned and operated a digital music store under various names since 2011, including "Google Music" at launch, and currently, "Google Play", all selling permanent downloads. Google Play currently has a catalog of over 40 million tracks for sale as permanent downloads in the U.S.

36.     Google received all the recordings of the Subject Compositions identified on Exhibits B-D from Pickwick (directly and/or through its distributor). Google then reproduced, distributed and sold these pirated recordings of the Subject Compositions on Google Play, without any license whatsoever, as permanent downloads among other types of digital phonorecord deliveries identified herein.

### *Pickwick*

37.     Upon information and belief, Defendant Pickwick Group Limited is a business entity organized under the laws of the United Kingdom with a place of business at Suite 1, Second Floor - Merritt House, Hill Avenue, Buckinghamshire, UK.

38.     Upon information and belief, Defendant Pickwick International Limited is a business entity organized under the laws of the United Kingdom with a place of

business at Suite 1, Second Floor - Merritt House, Hill Avenue, Buckinghamshire, UK.

39.    Upon information and belief, Defendant Pickwick Australia Pty Ltd is a business entity organized under the laws of Australia with a principal place of business at 35 Gosford Street, Mount Gravatt QLD 4122.

40.    Upon information and belief, Defendant Mastercorp Pty. Ltd. is a business entity organized under the laws of Australia with a principal place of business at 35 Gosford Street, Mount Gravatt QLD 4122.

41.    Defendants Pickwick Group Limited, Pickwick International Limited, Pickwick Australia Pty Ltd, and Mastercorp Pty. Ltd. are united in interest and shall be referred to, individually and collectively, as "Pickwick".

42.    Upon information and belief, Pickwick, without any authority, duplicated pre-existing  recordings embodying the Subject Compositions identified on Exhibits B-D, distributed them to Google for sale on Google Play without any license, and unlawfully authorized Google's making of digital phonorecord deliveries on Google Play as specifically set forth in the annexed Exhibit B-D.

43.    Upon information and belief, Pickwick is simply taking recordings of the Subject Compositions made by others without permission, duplicating and delivering them to Google under various label names, including but not limited to Cool Note, Foyer, Hallmark, Leverage, Mastercorp Pty. Ltd., P&R, Pickwick, Pickwick Group Ltd., and Roots, and authorizing Google to sell reproductions of the pirated copies.

**Jurisdiction, Venue and Joinder**

44.    This Court has personal jurisdiction over Defendants. Google has its principal place of business in this district and all Defendants have purposefully availed or directed their infringing activities in California.

45.    Further, Plaintiffs' copyright infringement claims arise out of (a) the reproduction and distribution of pirated recordings of the Subject Compositions listed

in Exhibits B-D, occurring in the Northern District of California, directly by Defendants and/or at their purposeful direction and availment, including the sale of pirated recordings of Subject Compositions to Northern District of California residents; or (b) transactions consummated within Northern District of California between Pickwick and Google concerning reproduction, distribution and delivery of the pirated recordings of the Subject Compositions.

46.     Pickwick (directly and/or through a distributor) intentionally directed and authorized Google to distribute the pirated recordings for sale through Google Play.

47.     Pickwick intentionally distributed and delivered the pirated recordings of the Subject Compositions identified in Exhibits B-D to Google, directly and/or through a distributor, and unlawfully authorized Google to reproduce these pirated recordings of the Subject Compositions through Google Play and to sell permanent downloads to California consumers.

48.     Venue is proper in this District pursuant to 28 U.S.C §§ 1391(b), 1391(c) and 1400(a) because Google has its principal place of business in this state. In addition, Defendants are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District.

49.     Joinder of Pickwick and Google is proper under Fed. R. Civ. P. 20 because Defendants are jointly and severally liable as members of a distinct distribution chain for the acts of copyright infringement identified herein.

**Harold Arlen**

50.     Harold Arlen (1905–1986) was a master composer and a highly regarded contributor to the Great American Songbook. The son of a synagogue cantor, Arlen was born in Buffalo, New York and emerged as one of the greatest American composers and songwriters, writing extraordinarily complex melodies and harmonies that remained accessible to a broad popular audience.

51.     Early in his career, Arlen wrote songs for musicals, including the entire scores for Broadway shows such as Cotton Club Parade, Life Begins at 8:40, Bloomer Girl, St. Louis Woman, Jamaica and Saratoga, among others.

52.     Arlen was also active in Hollywood and composed the music for some of the greatest film musicals of all time, most notably all the music in the 1939 motion picture classic "The Wizard of Oz," including *Ding, Dong! The Witch Is Dead*, *We're Off To See The Wizard*, and *Over The Rainbow*.

53.     *Over The Rainbow,* performed by Judy Garland in the film, won the Academy Award for Best Original Song. The song is one of the most enduring standards of the 20th century and was voted number one on the "Songs of the Century" list compiled by the Recording Industry Association of America and the National Endowment for the Arts. The American Film Institute also ranked *Over The Rainbow* the greatest movie song of all time.

54.     Arlen successfully collaborated with the greatest Tin Pan Alley lyricists, including "Yip" Harburg, Ira Gershwin, Johnny Mercer, Leo Robin and Ted Koehler.

55.     Arlen's partnership with Harburg extended over many decades. With Billy Rose, they wrote *It's Only A Paper Moon* in 1933. They followed up with a successful revue, Life Begins at 8:40, which included lyric collaborations with his old friend, Ira Gershwin, including *Fun to Be Fooled*, and *You're A Builder Upper*.

56.     Arlen was inducted into the Songwriters Hall of Fame in 1971 and was honored with its highest accolade, the Johnny Mercer Award, in 1982. In 1996, Arlen was honored and memorialized by the U.S. Postal Service with his own stamp:



12

### SA Music LLC and the Harold Arlen Trust

57.   Harold Arlen's son, Sam Arlen, acquired the U.S. copyrights in the Subject Compositions between 1989 and 2015, by termination notices that he, as sole statutory heir under Section 304 of the Copyright Act of 1976, served and filed with Copyright Office.

58.   In 2018, Sam Arlen assigned the U.S. copyrights in the Subject Compositions, as set forth in the Composition Chart annexed as Exhibit A, along with all accrued causes of action, to his company, SA Music, LLC. SA Music, LLC is the legal and/or beneficial owner of the U.S. copyright in certain of the Subject Compositions as identified in Exhibit A, along with all accrued causes of action.

59.   Plaintiff Harold Arlen Trust acquired the U.S. copyrights identified in the Composition Chart annexed as Exhibit A by operation of will and through termination notices served and filed by Harold Arlen during his lifetime with the U.S. Copyright Office under Section 304 of the Copyright Act of 1976.

60.   Plaintiff Harold Arlen Trust is the legal owner of certain of the U.S. copyright in certain of the Subject Compositions as identified in Exhibit A, along with all accrued causes of action.

### Ray Henderson

61.   Ray Henderson (1896-1970) was born in Buffalo, New York and studied piano and composition at the Chicago Conservatory where he cultivated a melodic style that helped him write enduring American standards, such as *Life Is Just A Bowl of Cherries*, *Bye Bye Blackbird*, and *Five Foot Two Eyes Of Blue*.

62.   Henderson was part of the most successful songwriting team of the late 1920s and 1930s, Henderson, Brown and DeSylva. The threesome created several memorable hits from the era including *It All Depends On You*, *Broken Hearted*, and *If I Had A Talking Picture of You.*

63.     Henderson contributed to several Broadway shows throughout his career including Manhattan Mary, George White's Scandals, Good News, Hold Everything, Three Cheers, Follow Through, Flying High, Hot-Cha, Strike Me Pink, Ziegfeld Follies of 1943 and Say When. In 1956, Henderson's songwriting life was the subject of a film called "The Best Things In Life Are Free" starring Gordon MacRae, Dan Dailey and Ernest Borgnine as the real-life songwriting team of Buddy DeSylva, Lew Brown and Ray Henderson.



64.     Ray Henderson was among those selected for the inaugural induction into the Songwriters Hall of Fame in 1970.

### Ray Henderson Music Co. Inc.

65.     Ray Henderson Music Co. Inc. is a Delaware corporation formed by Ray Henderson's children.  Ray Henderson Music Co. Inc. acquired the copyrights in the respective Subject Compositions by assignment from his children who acquired the copyrights by termination notices timely served and filed with U.S. Copyright Office under Section 304 of the Copyright Act of 1976.

66.     Plaintiff Ray Henderson Music Co. Inc. is the legal owner of the U.S. copyright in certain of the Subject Compositions as identified in Exhibit A, along with all causes of action.

### Harry Warren

67.     Harry Warren (1893-1981) has perhaps contributed more to the great American songbook than any other songwriter in history. Warren was born to Italian

immigrant parents in Brooklyn, New York. After serving in the US Navy in World War I, Warren began writing songs.

68.     In the years 1931 to 1945, Warren wrote more hit songs than Irving Berlin. He was nominated for the Academy Award for Best Song eleven times (more than Berlin, George Gershwin, Cole Porter or Richard Rodgers) and won three Oscars for composing *Lullaby of Broadway*, *You'll Never Know,* and *On the Atchison, Topeka and the Santa Fe*.

69.     Warren wrote over 800 songs including *Chattanooga Choo Choo,* the first song to receive a gold record, presented by RCA Victor in 1942, for sales of 1.2 million copies. Over the course of his career, Warren wrote 81 top 10 hits, including timeless classics such as *At Last*, *I Only Have Eyes For You*, *That's Amore*, *You Must Have Been A Beautiful Baby*, *Jeepers Creepers*, and *The Gold Diggers' Song (We're in the Money)*.



70.     Warren was one of America's most prolific film composers, and his songs have been featured in over 300 films. Harry Warren was inducted into the Songwriters Hall of Fame in 1971.

**Four Jays Music Company & Julia Riva**

71.    In 1955 Harry Warren formed the Four Jays Music Company, a California corporation, to own the copyrights in his musical works.

72.    Four Jays Music Company acquired the copyrights in the respective Subject Compositions by assignment from Harry Warren and third party music publishers, as well as by assignment by Harry Warren's wife, daughter, and grandchildren, who acquired the copyrights by termination notices timely served and filed with U.S. Copyright Office under Section 304 of the Copyright Act of 1976.

73.    Plaintiff Four Jays Music Company is a legal owner of the U.S. copyright in certain of the Subject Compositions as identified in Exhibit A, along with all accrued causes of action.

74.    Julia Riva is a legal owner of the U.S. copyright in certain of the Subject Compositions as identified in Exhibit A, along with all accrued causes of action, as a result of termination notices filed and served on or after January 1, 1997.

**The Subject Compositions**

75.    Plaintiffs are the owners of the musical compositions listed in the Composition Chart annexed as Exhibit A (collectively, the "Subject Compositions") that are the subject of this action.

76.    The copyrights for all the Subject Compositions have been registered and renewed with the U.S. Copyright Office, and each Subject Composition is the subject of a valid U.S. copyright. The Composition Chart annexed as Exhibit A identifies the copyright registration numbers for each of the Subject Compositions.

77.    Plaintiffs are the owner of a share in each of the Subject Compositions in the percentages listed on Exhibit A.

78.    As discussed more fully below, the Defendants have infringed, and are continuing to infringe, the copyright in each of the Subject Compositions by willfully reproducing and distributing them without a license.

## Background

79.   Before digital music distribution, recorded music was physically distributed through brick-and-mortar stores that were confined by the limitations of shelf space. Recording artists signed exclusive recording contracts with record labels in order to have their records pressed and distributed in national record stores.

80.   It is hard to imagine that a person walking into Tower Records, off the street, with arms full of CDs and vinyl records and claiming to be the record label for Frank Sinatra, Louis Armstrong and Ella Fitzgerald, could succeed in having that store sell their pirated copies directly next to the same albums released by legendary record labels, Capitol, RCA and Columbia, and at a lower price.

81.   Yet, this exact practice occurs every day in the digital music business, where there is unlimited digital shelf space (there are 40 million recordings available on Google Play) and a complete willingness by the digital music stores like Google to seek popular and iconic recordings from any source, legitimate or not, provided they participate in sharing the proceeds.

82.   The iconic status of the pirated recordings of the Subject Compositions at issue in this case cannot be overstated. Any list of the most popular singers and musicians of any period between 1930 and 1970 would be replete with the artists who have recorded Plaintiffs' musical works, some of them multiple times.

83.   All the recordings on the Infringement Chart (Exhs. B-D) embodying the Subject Compositions are pirated copies, or "bootlegs." Defendants' digital phonorecord deliveries of these pirated copies were all made without authorization from the copyright owners of the sound recordings or those who originally "fixed" them as required by Section 115 (discussed below), and the copyright owners of the Subject Compositions.

84.   Defendants all generate illicit revenue for themselves when these and other pirated copies are sold or distributed.

**The Pirated Recordings**

85.   All the recordings identified in Exhibits B-D are pirated. Defendants have taken recordings of the Subject Compositions – in which they hold no rights – and reproduced and distributed pirated copies of them to the public, for profit, without authorization.

86.   Virtually all the recordings at issue in this case were originally made between 1930 and 1972.

87.   Since Pickwick did not originally "fix" any of the relevant recordings, the only way for it to acquire the rights to duplicate and distribute them would be to purchase or license rights in these recordings.

88.   Upon information and belief, Pickwick never acquired permission or the rights to reproduce or distribute any of these recordings from any person who lawfully fixed them or from the owner of the copyright in the sound recording. Pickwick is simply taking previously released recordings and selling them as if they were the rightful owner. Google is duplicating Pickwick's pirated sound recordings of the Subject Compositions and selling the pirated copies for profit.

**Defendants Have Infringed the Subject Compositions**

89.   The Infringement Chart annexed as Exhibits B-D sets forth (1) each pirated recording of the Subject Compositions within the Pickwick-Google distribution chain thus far identified by Plaintiffs that these

90.   Each of the recordings identified in the Infringement Chart annexed as Exhibits B-D embodies at lease one of the Subject Compositions.

91.   Defendants have reproduced, distributed, imported, and/or made the recordings identified on Exhibits B-D available for digital phonorecord deliveries through Google's digital music.

92.     Plaintiffs have not authorized any reproduction or distribution or importation of the recordings of the Subject Compositions identified on Exhibits B-D.

93.     The various types of unauthorized reproductions, distributions, and/or digital phonorecord delivery configurations of each of the pirated recordings of the Subject Compositions made and/or authorized by Defendants are discussed briefly below.

### *Permanent Downloads*

94.     Permanent download means a digital transmission of a sound recording of a musical work in the form of a download, where such sound recording is accessible for listening without restriction as to the amount of time or number of times it may be accessed.

95.     Google has made available, reproduced, and distributed permanent downloads of the recordings of the Subject Compositions listed on Exhibits B-D to its customers.

96.     Google was unlawfully authorized and directed to do so by Pickwick (directly and/or by its distributor).

97.     Reproducing or distributing permanent downloads of recordings of the Subject Compositions require licenses from the copyright owners of the Subject Compositions and all the Defendants failed to obtain such licenses for each entry on the Infringement Chart at Exhibits B-D.

98.     The reproduction and distribution of permanent downloads of recordings of the Subject Compositions by Google, and the authorization of this activity by Pickwick, infringes Plaintiffs' exclusive reproduction and distribution rights under 17 U.S.C. § 106(1) and (3).

### Server Copies

99.    Pickwick has, directly and/or though a distributor, delivered to Google a copy of each recording of the Subject Compositions identified on Exhibits B-D.

100.   Google has reproduced at least one copy of each recording of the Subject Compositions identified on Exhibits B-D on its servers.

101.   Google has made one copy of each recording of the Subject Compositions identified on Exhibits B-D available for sale as permanent downloads through Google Play.

102.   Google was unlawfully authorized and directed to do so by Pickwick (directly and/or by its distributor).

103.   Making server copies of any of the recordings embodying the Subject Compositions identified on Exhibits B-D requires a license from the copyright owners of the Subject Compositions.

104.    Defendants failed to obtain such licenses for each of the recordings embodying the Subject Compositions identified on Exhibits B-D.

105.   Google's reproduction of server copies of pirated recordings of the Subject Compositions for sale of permanent downloads through Google Play, and authorization of this activity by Pickwick, as well the distribution of the server copies of pirated recordings of Subject Composition to Google, by Pickwick, infringes Plaintiffs' exclusive reproduction and distribution rights under 17 U.S.C. § 106(1) and (3).

### Making Available

106.   Defendants have made and continue to make available, or authorize making available, permanent downloads of the recordings of the Subject Compositions identified on Exhibits B-D to the public by delivering, uploading and/or offering them as permanent downloads through Google Play.

107.  The Defendants' making available recordings of the Subject Compositions identified on Exhibits B-D for permanent downloads, and authorization of this activity, by Pickwick, requires a license from the copyright owners of the Subject Compositions

108.  Google has made one copy of each recording of the Subject Compositions identified on Exhibits B-D available for sale as permanent downloads through Google Play.

109.  Google was unlawfully authorized and directed to do so by Pickwick (directly and/or by its distributor).

110.  Defendants failed to obtain such licenses for each recording of the Subject Compositions identified on Exhibits B-D and have thereby infringed Plaintiffs' exclusive distribution rights under 17 U.S.C. § 106(3) as a "deemed distribution." *A&M Records v. Napster*, 239 F.3d 1004, 1014 (9th Cir. 2001); *Perfect 10, Inc. v. Microsoft.com, Inc.*, 487 F.3d 701 718–19 (9th Cir. 2007).

### *Importation*

111.  Importation of phonorecords of a musical composition acquired outside the U.S. requires authorization of the owner of the copyright of the musical composition under Section 602 of the Copyright Act. Importation without the authority of the owner of the copyright in that composition is an infringement of the exclusive distribution rights under 17 U.S.C. § 106(3).

112.  Defendants have engaged in the unauthorized importation of phonorecords of the Subject Compositions, acquired outside the U.S., by digital phonorecord deliveries, or other means.

113.  The Pickwick entities are all located in the United Kingdom or Australia, outside the United States. Google and Pickwick (directly and/or through its distributor) have engaged in the importation of phonorecords of each recording

embodying the Subject Compositions listed on Exhibits B-D into the United States by digital phonorecord delivery, or other delivery of phonorecords.

114.   None of the Defendants obtained importation authorization from the U.S. copyright owners of the Subject Compositions.

115.   Defendants' respective importations of phonorecords embodying the Subject Compositions identified on Exhibits B-D infringe Plaintiffs' exclusive importation rights under 17 U.S.C. § 602 and distribution rights under 17 U.S.C. § 106(3).

**Willfulness**

116.   The infringing conduct of the Defendants is willful. Pickwick knows that it does not have authority to reproduce, distribute or for importation of the recordings of the Subject Compositions listed on Exhibits B-D, or to authorize these actions by Google. Pickwick has pirated thousands of recordings and sold them in the United States through Google Play.

117.   Further, Google has had knowledge of its infringing conduct and that of Pickwick and has continued to work with Pickwick and make digital phonorecord deliveries and other reproductions and distributions of the pirated recordings of the Subject Compositions that Pickwick provided and/or were recklessly indifferent or willfully blind to its own infringing conduct.

118.   Google has willfully failed to employ adequate human resources, screening mechanisms, or use of digital fingerprinting technology to detect unlawfully duplicated recordings on Google Play that it routinely uses for other services, for example, Google's "scan and match" service and YouTube.

119.   In addition to the recordings identified on Exhibits B-D, there are believed to be many other pirated recordings of the Subject Compositions that Defendants have reproduced and distributed without authorization that Plaintiffs have not yet identified or that are no longer available on Google Play.

120.   The infringement by Defendants of each Subject Composition on each pirated recording identified in the Infringement Chart at Exhibits B-D began as of the date of upload, receipt, delivery to and/or reproduction by Google of server copies of the pirated recordings of the Subject Compositions designated for reproduction and distribution by Pickwick through Google Play and continues to the present. The infringements identified in Exhibits B-D all occurred within three years of filing this Complaint.

121.   By their conduct described above, Defendants have infringed and are continuing to infringe Plaintiffs' copyrights on a regular basis in violation of 17 U.S.C. §§ 101, 106, 115, 501, 602 *et seq.*

122.   As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to elect either an award of actual damages, including Defendants' profits, or statutory damages under 17 U.S.C. § 504(c).

123.   Defendants' infringement is and has been willful, intentional, purposeful and with willful disregard of the rights of Plaintiffs. Anything less than maximum statutory damage awards would encourage infringement, amount to a slap on the wrist, and reward Defendants for their willful infringement on a grand scale.

124.   Plaintiffs are also entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

125.   Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction prohibiting Defendants from reproducing, distributing, making available, importing and selling the pirated recordings of the Subject Compositions without license or authorization in violation of the Copyright Act.

**First Claim for Copyright Infringement by SA Music LLC
and William Kolbert, as Trustee of the Harold Arlen Trust**

126.   Plaintiffs repeat each and every allegation of the Complaint.

127.   Plaintiffs  SA Music LLC and William Kolbert as Trustee of the Harold Harlen Trust claim that Defendants Pickwick and Google have unlawfully reproduced, distributed, made available, and imported unauthorized recordings embodying the Subject Compositions including, but not limited to, those identified in Exhibit B by the methods identified herein, and/or have unlawfully directed or authorized this activity.

128.   Defendants have thereby willfully infringed Plaintiffs' copyrights in the Subject Compositions in violation of the Copyright Act.

**Second Claim for Copyright Infringement
by Ray Henderson Music Co., Inc.**

129.   Plaintiffs repeat each and every allegation of the Complaint.

130.   Plaintiff Ray Henderson Music Co., Inc. claims that Defendants Pickwick and Google have unlawfully reproduced, distributed, made available, and imported unauthorized recordings embodying the Subject Compositions including, but not limited to, those identified in Exhibit C by the methods identified herein, and/or have unlawfully directed or authorized this activity.

131.   Defendants have thereby willfully infringed Plaintiff's copyrights in the Subject Compositions in violation of the Copyright Act.

**Third Claim for Copyright Infringement
by Four Jays Music Company and Julia Riva**

132.   Plaintiffs repeat each and every allegation of the Complaint.

133.   Plaintiffs Four Jays Music Company and Julia Riva claim that Defendants Pickwick and Google have unlawfully reproduced, distributed, made available and imported unauthorized recordings embodying the Subject Compositions

including, but not limited to, those identified in Exhibit D by the methods identified herein, and/or have unlawfully directed or authorized this activity.

134.   Defendants have thereby willfully infringed Plaintiff's copyrights in the Subject Compositions in violation of the Copyright Act.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendants, jointly and severally, as follows:

1.   A declaration that Defendants have infringed Plaintiffs' copyrights in the Subject Compositions in violation of the Copyright Act;

2.   A declaration that each of Defendants' infringements was willful;

3.   At Plaintiffs' election, an award of Plaintiffs' actual damages, including Defendants' profits, or a separate award of statutory damages in amounts to be determined by the jury for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally;

4.   A permanent injunction barring the Defendants from continued infringement of Plaintiffs' copyrights in the Subject Compositions pursuant to 17 U.S.C. § 502; and

5.   Reasonable attorneys' fees and costs of this action, statutory pre-judgment interest, and such other relief as this Court may deem just and proper.

Dated:      New York, New York
            April 20, 2020

                        Respectfully submitted,

            By:     /s/   Allen Hyman
                    Allen Hyman (California State Bar No. 73371)
                    LAW OFFICES OF ALLEN HYMAN
                    10737 Riverside Drive
                    North Hollywood, CA 91602
                    Phone: (818) 763-6289
                    E-mail: lawoffah@aol.com

                    Matthew F. Schwartz  *(Pro Hac Vice Pending)*
                    Brian S. Levenson  *(Pro Hac Vice Pending)*
                    SCHWARTZ, PONTERIO & LEVENSON, PLLC
                    134 West 29th Street, Suite 1001
                    New York, New York 10001
                    Phone: (212) 714-1200
                    E-mail: mschwartz@splaw.us
                    E-mail: blevenson@splaw.us

                    Oren S. Giskan  *(Pro Hac Vice Pending)*
                    GISKAN SOLOTAROFF & ANDERSON LLP
                    90 Broad Street, 10th Floor
                    New York, New York 10004
                    Phone: (212) 847-8315
                    E-mail: ogiskan@gslawny.com

                    *Attorneys for Plaintiffs*

1

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Local Civil Rule 38, and otherwise, Plaintiffs respectfully demand a trial by jury on all issues so triable.

Dated:          New York, New York
                April 20, 2020

Respectfully submitted,

By:      /s/   Allen Hyman
         Allen Hyman (California State Bar No. 73371)
         LAW OFFICES OF ALLEN HYMAN
         10737 Riverside Drive
         North Hollywood, CA 91602
         Phone: (818) 763-6289
         E-mail: lawoffah@aol.com

         Matthew F. Schwartz  *(Pro Hac Vice Pending)*
         Brian S. Levenson  *(Pro Hac Vice Pending)*
         SCHWARTZ, PONTERIO & LEVENSON, PLLC
         134 West 29th Street, Suite 1001
         New York, New York 10001
         Phone: (212) 714-1200
         E-mail: mschwartz@splaw.us
         E-mail: blevenson@splaw.us

         Oren S. Giskan  *(Pro Hac Vice Pending)*
         GISKAN SOLOTAROFF & ANDERSON LLP
         90 Broad Street, 10th Floor
         New York, New York 10004
         Phone: (212) 847-8315
         E-mail: ogiskan@gslawny.com

         *Attorneys for Plaintiffs*